IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| LA'SHADION SHEMWELL, in § <br> his official capacity as a city council § <br> member, and in his individual capacity as § <br> a voter in District 1, and FLORINE § <br> HENRY, and DEBRA FULLER, § <br> § <br> *Plaintiffs*, § <br> v. § <br> § <br> CITY OF MCKINNEY, TEXAS § <br> § <br> *Defendant*. § | CIVIL ACTION NO. 4:20-cv-00687-SDJ <br><br> JURY DEMAND |

**PLAINTIFFS' SUR-REPLY IN FURTHER RESPONSE/OPPOSITION TO DEFENDANT CITY OF MCKINNEY'S MOTION TO DISMISS**

**Blerim Elmazi, Esq.**
Texas Bar No. 24118375
**MERRITT LAW FIRM, LLC**
1910 Pacific Avenue, Suite 8000
Dallas, TX. 75021
Tel. (888) 647-3041
blerim@leemerrittesq.com

**S. Lee Merritt, Esq.**
PA Bar No. 314891
**MERRITT LAW FIRM, LLC**
1910 Pacific Avenue, Suite 8000
Dallas, TX 75201
Tel. (888) 647-3041
lee@leemerrittesq.com

**Shayan Elahi, Esq.**
Texas Bar No. 24080485
**Law Offices of Shayan Elahi**
13601 Preston Road, Suite E770
Shayan@elahilawfirm.com

**ATTORNEYS FOR PLAINTIFFS**

**PLAINTIFFS' SUR-REPLY IN FURTHER RESPONSE/OPPOSITION TO DEFENDANT CITY OF MCKINNEY'S MOTION TO DISMISS**

TO THE HONORABLE JUDGE OF SAID COURT:

### I.  ARGUMENT & AUTHORITIES

The City relies primarily on two assertions in its argument that Plaintiffs' Complaint should be dismissed without proceeding to discovery. First, the City incorrectly asserts that the City of McKinney was not the "moving force" behind the violations of Plaintiffs' statutory and constitutional rights that were plead in its § 1983 cause of action. As detailed below, Plaintiffs have met the federal pleading standard at this stage and are able to distinguish the City's reliance on the *McBride v. Jasper* case. Second, the City incorrectly asserts that Section 2 of the Voting Rights Act is inapplicable to recall elections. As discussed in further detail below, the statutory language and congressional history make it clear that Section 2 applies to recall elections.

**A.   The City of McKinney was the "moving force" behind the violations of Plaintiffs' statutory and constitutional rights.**

**1.   The City voluntarily and intentionally initiated and inserted itself into the recall petition process.**

In the hearing on Defendant's Motion to Dismiss, as well as in the motion itself, the City argued that the recall petition process was initiated by citizens of McKinney and that "Consistent with the Complaint, the recall petition process has never been a matter in which the City voluntarily inserted itself or acted with even a modicum of discretion; the process has always been and remains citizen-driven" (ECF Doc. 3 at Page 13). The City completely ignores Plaintiffs' specific allegations that "City officials also pushed forward a charter amendment, which expands the electorate of Councilman Shemwell's recall election to include the entire city, which is predominantly white. They pushed the amendment forward because they know that, due to racially polarized voting patterns in McKinney, it is virtually impossible for Councilman

Shemwell to win in a citywide election" (ECF Doc. 1 at ¶ 7). Although the Court's October 22nd hearing was not an evidentiary hearing, Plaintiffs discussed what evidence they expected to uncover through the discovery process.

The City argues that Mayor Fuller's actions as a private citizen in regards to the recall petition and election have no bearing on the City's moving force argument. The Mayor, along with several members of the McKinney City Council, publicly shared their support of the recall election changes and the recall election against Councilman Shemwell while speaking from the City Council dais during public meetings. The City cannot argue on behalf of the Mayor, as the head official and elected executive of the City, that his public comments on the dais were somehow disassociated with the City. In at least one such city council meeting, while speaking from the dais Mayor Fuller discussed his support of the recall of Councilman Shemwell by stating "I have been vocal and I have not been impartial, that's been no secret. I've handled myself differently than Councilman Phillips, and I understand his position and I've expressed mine."

On October 23, 2019, Mayor Fuller appeared on the radio show Rick Roberts Show - WBAP News Talk with a subject title listed as "Mayor George Fuller McKinney Responds to La'Shadion Shemwell." In his interview, the Mayor did not limit his remarks to those of a private citizen. In fact, the Mayor talked almost exclusively of what would become his official role in promulgating the recall efforts against Councilman Shemwell once Councilman Shemwell issued his "Black State of Emergency" warning residents of the rise of police brutality in Black and Latino communities. Specifically, the Mayor stated that "I said I would lead a charge to remove him from Council because I believe he's putting residents in harm's way."

On November 23, 2019, Mayor Fuller posted on Facebook an extensive post titled under his mayoral username, Mayor George Fuller, and discussed the time and place for a signature drive regarding the recall petitions initiated against Councilman Shemwell. Furthermore, and perhaps most astonishing, the Mayor was involved in both organizing and paying individuals to collect signatures on the recall petition for Councilman Shemwell. Many of the Mayor and City Council's actions and comments occurred right on the dais and were not reserved only to their private lives. Plaintiffs should be allowed to proceed to discovery to fully uncover the City's involvement in promulgating the charter amendment changes and the recall petition.

## 2. The City of McKinney, and not voters in McKinney, are the "moving force" behind the charter amendment and recall election.

The City argued in the hearing and in its Motion to Dismiss that "The voters will decide the fate of Councilman Shemwell in an election in which Defendant City of McKinney will cast no vote. Those same voters, not the City, will be the "moving force" and the final authority to make that determination, thereby breaking any direct causal connection between the City's actions and Plaintiffs' alleged injuries and absolving the City of liability under § 1983" (ECF Doc. 3 at Page 14).

Holding a municipality liable under Section 1983 (i.e., *Monell* liability) requires establishing (1) a policymaker; (2) an official policy; and (3) that the policy is the "moving force" behind a violation of a constitutional right. *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018). An official policy can take the form of a written policy, ordinance, or regulation; or it can take the form of a widespread practice that is so common and well settled as to constitute a custom that fairly represents municipal policy. *Id*. at 389–90. That policy, in turn, must be the "moving force" behind the constitutional violation. *Id.* at 390. Plaintiffs have

adequately met each and every element in asserting the City's liability. Plaintiffs established that the policymakers of the City, which is the McKinney City Council, amended its city charter in May 2019 pursuant to a ballot initiative regarding recall elections for elected officials. (ECF Doc. 1 at ¶ 40). Plaintiffs specifically alleged that although the recall petition drive was masked as citizen-driven, it served as the de factor arm of the Mayor and City Council of McKinney. (ECF Doc. 1 at ¶ 41). The City's argument that the voters are the moving force for these violations does not acknowledge that it is the city charter, i.e. the City, that changed the law and allowed these voters to vote on the recall citywide rather than restricted to districts.

In conclusion, the City has attempted to shirk away from the high level of involvement that has been uncovered pre-discovery by Plaintiffs regarding the City's involvement in promulgating the recall changes. It was the City's action, by and through the Mayor and City Council, which brought about the charter amendment changes and the extraordinary lengths the Mayor went to in his official capacity to achieve the recall of Councilman Shemwell is enough to show the City was a moving force behind the violations of Plaintiffs' rights.

**B.     The law is clear that Section 2 of the Voting Rights Act applies to recall elections and the ability of voters to participate in an election without having their votes diluted.**

The Supreme Court has stated that courts should interpret the Voting Rights Act "in a manner that provides the broadest possible scope." *Chisom v. Roemer*, 501 U.S. 391, 403 (1991). Section 2 of the Voting Rights Act prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in one of the language minority groups outlined in the Act. 42 U.S.C § 1973. A challenged procedure may fall under Section 2 when there is evidence of racial motivation or intent to discriminate. *See Welch v. McKenzie*, 765 F.2d at 486; *Dillard v.*

*Town of North Johns*, 717 F. Supp. 1471, 1476 (M.D. Ala. 1989). Furthermore, a challenged practice may fall within the scope of Section 2 when the practice results in the disenfranchisement of minority voters. *See Goodloe v. Madison Cnty Bd. Of Election Com'rs*, 610 F. Supp. 240, 242 (S.D. Miss. 1985).

Plaintiffs' Complaint sufficiently alleges that the charter amendment changes and recall effort against Councilman Shemwell by the City were racially motivated, and, as a result fall within the scope of Section 2. Specifically, Plaintiffs alleged that "The Charter Amendment was therefore designed to prevent Black and Latino voters in District 1 from having an equal opportunity to elect and remove a candidate of their choice" (ECF Doc. 1 at ¶ 7). Although this may be a case of first impression in the Fifth Circuit, the language of Section 2, and the guidance provided by the courts in *Welch* and *Goodloe* regarding racial motivation and disenfranchisement of minority voters provide sufficient support to conclude that the Section 2 is applicable in the present matter.

> **1. Defendant's reliance on the *McBride* case disregards the significant factual differences between *McBride* and the recall of Councilman Shemwell.**

In the hearing on the City's Motion to Dismiss and in the motion itself, the City relies heavily on *McBride* because it believes the Court's decision regarding the recall of those city councilmembers is somehow favorable to the facts of this case. However, there are clear distinctions between *McBride* and the present case that virtually eliminate any effective support the case could have given the City. In fact, as the Court noted during the hearing, the Court opined in *McBride* that "Common sense suggests that the ability to recall a single-member district's representative should be restricted to only those voters with the authority to vote in the recall election itself."

      **a.**     ***McBride* concerns recall of council members in their respective districts, unlike in the present case where a single-district member of the City Council is subjected to recall by the entire city.**

In *McBride*, the Court opined that "A violation of the one-person-one-vote principle could possibly arise if the recall elections… were not limited to their respective districts, but the Ninth Court of Appeals ordered the city to limit those elections to the residents of the single-member districts… Thus, the individual residents of each single-member district have a vote that is equal in weight to the residents of other districts – only the residents of a single-member district may vote to elect their single-member district council member and only those residents may vote in a recall election for that council member." *McBride v. City of Jasper*, 2011 U.S. Dist. LEXIS 172650 at 17-18. In the present case, there has been no similar ruling that would have limited the citywide recall to just Councilman Shemwell's district, District 1. As a result, there is enough support to suggest that Plaintiffs have made out cognizable claims because the recall is still set to occur on a citywide basis, unlike in *McBride*.

      **b.**     **Demographics of the City of Japer are vastly different from the City of McKinney and relevant in ascertaining the motivation of race in pursuing the recall.**

The *McBride* Court detailed that the City of Jasper charter provision concerning recalls could not be used as an "instrument of oppression" despite Plaintiffs assertion that racial tension existed in the city. *Id*. at 25. In fact, the City of Jasper at the time had a population that was approximately half African American and half white. *Id*. Additionally, four of the five council member seats belonged to African Americans, which even included a council member elected at-large and a council member elected in a district that was predominantly white.

The facts concerning Councilman Shemwell and the City of McKinney could not be more different than those in *McBride*. First, unlike the City of Jasper, the City of McKinney has a very small minority population with only 10.82% of residents classified as Black or African

American alone according to the last census. ECF Doc. 1 at ¶ 22. There have only ever been 2 Black representatives in the City of McKinney and both were elected in the majority-minority District 1. Councilman Shemwell is the only Black city council member on the McKinney City Council. No Black representative has ever won a citywide election in McKinney. While it may have been possible for a Black candidate to win a citywide recall in Jasper, it is virtually impossible in McKinney given racially-polarized voting and that the councilman is being subjected to a vote much greater than those who were allowed to vote him into office.

Regarding racial tensions within the city, the City of McKinney has received national attention for various incidents involving racial animus, including the infamous 2015 "McKinney Pool Party" assault and the City's decision to keep its Confederate statute in the downtown square. The facts in the present matter indicate that there was a racial motivation in bringing about the charter amendment concerning recall elections because the city's history and attitude towards Councilman Shemwell demonstrate the government was willing to do whatever it took to get him out of office.

    **c.**  **The recall procedures were already in place in *McBride* whereas the City in the present case pursued charter amendment changes before immediately pursuing the recall of Councilman Shemwell.**

The city charter was amended in May 2019 with the controversial changes that reduced the number of signatures required to recall an official, increased the number of days allowed to gather signatures, and clarified that recall elections would take place citywide, even in cases involving a single-member district councilmember. In *McBride*, the councilmembers subject to the City's recall were operating under a city charter that was decades old in regards to recall elections. In the present case, Councilman Shemwell and voters in his district were forced to operate under newly enacted recall provisions just months after its passage. The City's goals were clear in pushing for the charter amendment and the recall of the councilman: force

Councilman Shemwell to mount a citywide recall defense knowing he would almost certainly lose his seat because his majority-minority district would not be strong enough to defend him against the heavy white majority outside of District 1.

### 2. Case law across the country shows that Section 2 is to be interpreted broadly and apply to recall elections.

In regards to "issue" elections, the Defendant in *Armstrong v. Allain* similarly argued that Section 2 should not apply to voter dilution claims in an issue election that required school bond referenda to be passed by a 60% vote rather than a majority vote. *Armstrong v. Allain*, 893 F. Supp. 1320 (S.D. Miss. 1994). Plaintiffs argued that this new law diluted Black voter strength, and the Court agreed that Congress intended for Section 2 to apply. *Id*. at 1324. The Court pointed out that as plaintiffs in the case mentioned, the United States Attorney General testified, prior to the 1965 enactment of the Voting Rights Act, that "[e]very election in which registered voters are permitted to vote would be covered" under Section 2. *Id*. at 1323. In regards to an elected judiciary and voter dilution claims, the Supreme Court determined that the 1982 amendments to the Voting Rights Act was designed to expand coverage, not restrict it. *Chisom v. Roemer*, 501 U.S. 380 (1991). 2367.

In *Operation King's Dream v. Connerly*, the plaintiffs challenged an initiative petition that was used to put an anti-affirmative action proposal on the ballot for the general election because they argued the signatures gathered were a result of racially-targeted voter fraud. *Operation King's Dream v. Connerly*, No. 06-12773, 2006 WL 2514115 (E.D. Mich. 2006). The Court found that *Montero* and *Delgado* (two decisions cited by Defendant City of McKinney) are unpersuasive. First, the basis for those decisions, that signing an initiative petition does not involve a choice between two alternatives, is wrong. Signing an initiative petition does involve

choice-whether to sign or not to sign the petition. Therefore, the *Montero* and *Delgado* courts erred in holding that the petition process did not implicate voting on that ground. In light of the section's broad language, the legislative history, and the broad construction required in light of the statute's remedial purposes, the Court in *Smith v. Allwright* concluded that Section 2 applies to the initiative petition process at issue which is a "practice or procedure" imposed or applied by the state for the purposes of 42 U.S.C. § 1973(a). *Smith v. Allwright*, 321 U.S. 649 (1944).

In *Tigrett v. Cooper*, the Court examined whether the Voting Rights Act applied to the case because the dual-majority voting requirement only applied to a single-shot referendum vote, not an election for a representative. (760) The court concluded that the Voting Rights Act did apply after reviewing the courts' analysis in *Armstrong* and *Operation King's Dream*. *Tigrett v. Cooper,* 855 F. Supp. 2d 733 (W.D. Tenn. 2012). Based on the broad remedial purpose behind the Voting Rights Act and the extensive legislative history, the Court concluded that the Voting Rights Act applies to the referendum vote's dual majority requirement. Although the city- county consolidation vote at issue did not appear to fall within the Voting Rights Act's statutory text, given Courts' broad interpretations of the Voting Rights Act, the Court found it prudent to step beyond the bounds of the Voting Rights Act's language.

In *Mallory v. Eyrich*, plaintiffs were black residents who were qualified to vote in judicial elections and challenged the countywide election system arguing in part that it violated the Voting Rights Act. *Mallory v. Eyrich*, 839 F.2d 275, 276 (6th Cir. 1988). The court had to determine whether Section 2 of the Voting Rights Act applied to judicial elections and whether judges are "representatives." It concluded that the elections were in the scope of the Voting Rights Act. *Id*. at 276. In its conclusion the court referenced *South Carolina v. Katzenbach* and *Allen v. State Board of Elections*. "There is no hint in either of these opinions that any

state or local election, whatever the office involved, is exempted from coverage of the 1965 Act." *Id*. at 278.

## II.   CONCLUSION

For at least these reasons, Plaintiffs respectfully request that Defendant's 12(b)(6) motion to dismiss be denied in its entirety. Alternatively, should this Court determine that Defendant's motion should be granted in some respect, Plaintiffs respectfully request that they be granted leave to amend her Complaint pursuant to Federal Rule of Civil Procedure 15(a). Plaintiffs further request all such other relief to which she may be entitled, by law or in equity.

Respectfully Submitted,

**ATTORNEYS FOR PLAINTIFFS**

### CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2020, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Blerim Elmazi*
**Blerim Elmazi**