# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| LA'SHADION SHEMWELL, in his official capacity as a city council member, and in his individual capacity as a voter in District 1, and FLORINE HENRY, and DEBRA FULLER, | § § § § § § | |
| *Plaintiffs*, | § | CIVIL ACTION NO. 4:20-cv-00687-SDJ |
| v. | § § | JURY DEMAND |
| CITY OF MCKINNEY, TEXAS | § § | |
| *Defendant*. | § | |

---

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN FURTHER RESPONSE/OPPOSITION TO DEFENDANT CITY OF MCKINNEY'S MOTION TO DISMISS

---

**Blerim Elmazi, Esq.**
Texas Bar No. 24118375
**MERRITT LAW FIRM, LLC**
1910 Pacific Avenue, Suite 8000
Dallas, TX. 75021
blerim@leemerrittesq.com

**S. Lee Merritt, Esq.**
PA Bar No. 314891
**MERRITT LAW FIRM, LLC**
1910 Pacific Avenue, Suite 8000
Dallas, TX 75201
lee@leemerrittesq.com

**Shayan Elahi, Esq.**
Texas Bar No. 24080485
**Law Offices of Shayan Elahi**
13601 Preston Road, Suite E770
Shayan@elahilawfirm.com

**ATTORNEYS FOR PLAINTIFFS**

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN FURTHER RESPONSE/OPPOSITION TO DEFENDANT CITY OF MCKINNEY'S MOTION TO DISMISS**

TO THE HONORABLE JUDGE OF SAID COURT:

Pursuant to the Court's November 17, 2020 Order on Supplemental Briefing (ECF 14), Plaintiffs file this Brief in Further Response/Opposition to Defendant City of McKinney's Motion to Dismiss and would show the Honorable Court as follows:

A.      **Plaintiffs' claims are not moot and their Complaint has sufficiently alleged constitutional and Voting Rights Act claims that should be allowed to move forward at this stage of litigation.**

In the City of McKinney's sur-reply (ECF 13) brief on its Motion to Dismiss the City once again misrepresents the legal issues in the present matter. The City argued that "Even had the City limited the recall election solely to District 1 voters (as Plaintiffs requested), the result would have been the same: Councilman Shemwell would have been recalled by District 1 voters in the same manner that he was recalled and removed by the voters citywide." While the City may believe the issues articulated in Plaintiffs' Complaint are related to solely Councilman Shemwell, the City ignores the fact that there are two additional plaintiffs who are qualified voters and residents in District 1. The unconstitutional scheme in place in regards to recall elections within the City of McKinney remain intact, even despite the recall of Councilman Shemwell.

In the event that Councilman Shemwell is ever to run for city council within McKinney again, he would be subjected to the exact same unconstitutional scheme that he has already been

---

PLAINTIFF'S SUPPLEMENTAL BRIEF IN FURTHER
RESPONSE/OPPOSITION TO DEFENDANT
CITY OF MCKINNEY'S MOTION TO DISMISS

recalled through. Nothing would stop the City from again recalling Councilman Shemwell in an at-large manner, despite the numerous case law cited in Plaintiffs' previous briefs indicating that Section 2 of the Voting Rights Act was intended to cover all elections in which voters participate. If Councilman Shemwell meets the qualifications to run for city council within the City, nothing would legally prevent him from doing so. However, there exist clear and obvious issues that would deter Councilman Shemwell or any other Black or Latino resident from running for city council within District 1.

The possibility of recalling a single-district city council member would weigh heavily on any Black or Latino candidate considering a campaign for city council. Given the facts alleged in Plaintiffs' Complaint, it is clear that there existed an obvious bias among city leaders in regards to the election of Councilman Shemwell. Early on city leaders agreed they would pursue attempts to remove the councilman from his seat. This sort of dominance by city leaders in pushing the recall petition, as well as mobilizing voters for the recall changes and election are nothing short of warnings to future candidates seeking to challenge city leadership or policy. If such treatment was given to Councilman Shemwell, then it certainly can be again given to any other candidate running as a single-district member within the city.

The City's reliance on voting outcomes in the November election are both misleading and distractions from the central legal issues alleged in the Complaint. It must be noted that to Plaintiffs' knowledge, no city council member has ever had to face election, re-election or a recall election in the month of November. In fact, no recall has ever occurred within the City before. This is significant because the hotly contested November elections mobilize a much large number of voters than do the typical city elections that occur in May. While Councilman

Shemwell would ordinarily be required to defend his seat in May, he was forced to mount a city-wide campaign in a presidential election year. The vast majority of voters voting in the councilman's recall in November were likely there because of the presidential election, rather than having any knowledge of even the existence of the recall election. The total number of votes cast in Councilman Shemwell's May 2017 election, prior to the runoff, was 1,164 votes according to the Collin County government site. That number is fairly typical for District 1 city council races. The total number of votes cast city-wide for Mayor of McKinney, in contrast, was 11,101 votes, which is also fairly typical. The recall proposition in the November election had a drastically higher total number of voters with a total of 66,847 votes. Given this context, it would be misguided for the City to argue that a majority of District 1 voters voted to recall the councilman without acknowledging the broader circumstances and unusual nature of voting on a recall during a presidential election.

Plaintiffs' arguments and claim that Black and Latino voters have their votes diluted under the new McKinney Charter scheme is still valid, and certainly enough to survive at the motion to dismiss stage of litigation. Even in the context of a majority of District 1 voters voting to recall the councilman there is evidence to suggest that a majority of those voters were not Black or Latino and therefore did not suffer vote dilution. Approximately 86% of those voting to recall the councilman are residents outside of District 1. At this early stage there is not enough data to suggest demographics of those voting in the election, however the fact still remains that future candidates or Councilman Shemwell himself would still be subjected to this newly-adopted recall election scheme.

Councilman Shemwell was forced to mount a city-wide campaign effort to challenge the recall election. While it may be convenient for the City to point out that District 1 voters voted to recall the councilman there is no acknowledgment that this same system could subject future candidates and voters within the district to vote dilution. Plaintiffs have provided ample evidence and case law to show that its claims are still viable, especially at the motion to dismiss stage. As a result, Plaintiffs should be allowed to proceed with discovery and proving its case.

**B.      The Doctrine of Justiciability's application to the case at bar.**

The Supreme court has deemed certain controversies "capable of repetition, yet evading review,"  for example, in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, an advocacy organization claimed that restrictions on electioneering communications established by the Bipartisan Campaign Reform Act of 2002 unconstitutionally prohibited the organization from broadcasting certain political advertisements shortly before the 2004 election. *Federal Election Commission v. Wisconsin Right to Life*, 551 U.S. 449 (2007). Although the case did not reach the Supreme Court until long after the 2004 election had passed, the Court nonetheless concluded that the case was not moot. The Court deducted that the organization credibly claimed that it planned on running 'materially similar' future targeted broadcast ads in advance of future elections, and the period between elections was too short to allow the organization sufficient time to fully litigate its constitutional challenges sufficiently in advance of the election date.

Extrapolating from that reasoning in relation to the case at bar, due to the fact that the City had already set the elections, and due to the COVID-19 pandemic, the election had been moved from May 2020 to November 2020, therefore it would certainly be cost prohibitive and

confusing to stop the election while the matter is being litigated – regardless, the claim of voter dilution has not be put to bed. There will be elections held in McKinney District 1 every few years, and every few years the issue will continue to arise as to whether a representative from a majority-minority district is to be recalled city-wide in violation of federal law.

**C.     Plaintiffs have sufficiently alleged the elements of a vote-dilution claim under**
**        *Thornburg v. Gingles*.**

Section 2 claims under the Voting Rights Act require a fact-intensive analysis with a "comprehensive, not limited, canvassing of relevant facts." *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986); *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994). A proper and detailed analysis of these facts is not available, nor is it feasible, at this early motion to dismiss stage of litigation. There is no extensive evidentiary record for the Court to properly determine these fact issues at the motion to dismiss stage. A two-part framework for evaluating Section 2 vote dilution claims has been developed through caselaw. The first part of this framework consists of the three *Gingles* preconditions: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a proposed single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it to routinely defeat the minority's preferred candidate.

The second part of this framework consists of an evaluation of the totality of the circumstances to show that the minority group does not have an equal opportunity to participate in the political process and elect representatives of their choice. *Gingles*, 478 U.S. at 45. The Court included several potential factors that could be used to further analyze a claim under the

---

totality of circumstances. Most relevant to the case at bar, these factors would include: The extent to which voting in the elections of the state or political subdivision is racially polarized; The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process; Whether political campaigns have been characterized by overt or subtle racial appeals; The extent to which members of the minority group have been elected to public office in the jurisdiction; and whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. *Id.* at 36-37.

At the pleading stage, Plaintiffs are not required to prove each of the *Gingles* preconditions, but instead are only required to sufficiently allege facts to which a reasonable inference can be drawn. Federal courts do not require "heightened fact pleading of specifics" at this stage of litigation, although it may be required in further stages. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Here, Plaintiffs have sufficiently alleged facts satisfying each of the *Gingles* preconditions. As a result, the Court should deny Defendant's request to impose heightened pleading and evidentiary requirements that are inappropriate at the pleading stage of litigation.

1. **_Gingles_ Precondition 1 - Black and Latino voters in District 1 are sufficiently large and geographically compact.**

Plaintiffs have sufficiently alleged that Black and Latino voters in District 1 are sufficiently large and geographically compact to constitute a majority in a single-member district. *See Gingles*, 478 U.S. at 50. In their Complaint, Plaintiffs provided extensive

---

PLAINTIFF'S SUPPLEMENTAL BRIEF IN FURTHER
RESPONSE/OPPOSITION TO DEFENDANT
CITY OF MCKINNEY'S MOTION TO DISMISS

demographic figures demonstrating that District 1 is a majority-minority district. Specifically, Plaintiffs alleged that District 1 is comprised of nearly 60% residents identified as Black or Latino, with an additional 3% identified as Asian according to demographics provided by the City of McKinney (ECF 1 at ¶ 31). Plaintiffs further alleged that "District 1 is a majority-minority district in terms of its total population and voting age population. District 1 is located on the east side of McKinney and contains the highest number of minority voters within the City of McKinney" (ECF 1 at ¶ 28). Plaintiffs go on to plead that "The City of McKinney still remains relatively segregated, with most minority residents living in the east side of the city and located within the boundaries of District 1" (ECF 1 at ¶ 29).

Accepting Plaintiffs allegations as true and viewing these facts in the light most favorable to Plaintiffs, they more than plausibly allege that Black and Latino voters are sufficiently large and geographically compact to comprise a majority of the single-member District 1.

2.    *Gingles* **Preconditions 2 & 3 – Black and Latino voters in District 1 are politically cohesive and their candidates of choice are usually defeated by the white majority bloc.**

With respect to *Gingles* 2 and 3, Plaintiffs alleged in their Complaint that "Voting patterns within District 1 and the City of McKinney are racially polarized. These polarized voting patterns are correlated with the two major political parties present within the city. The Black and Latino voters within District 1 and in the city are politically cohesive in support of their candidates of choice, who are overwhelmingly opposed by white voters" (ECF 1 at ¶ 8). Plaintiffs further plead that minority candidates running city-wide failed to win due to the voting strength of the white majority voting bloc within the city. For example, Michael Jones was an

African American resident running city-wide and only garnered 18.01% of the vote from the city (ECF 1 at ¶ 53). On the contrary, the only Black or Latino candidates ever elected in McKinney all derive from District 1. No Black or Latino candidate has ever won city-wide in McKinney. Accepting these allegations as true, Plaintiffs plausibly allege that the white bloc vote usually defeats candidates preferred by Black and Latino voters.

In addition to the *Gingles* preconditions, Plaintiffs have also alleged, though Defendants ignore, abundant evidence that in the totality of circumstances, social and historical conditions interact with the voting practices to impair the ability of Black voters to elect their candidates of choice. Specifically, Plaintiffs have shown evidence of income and educational levels of residents of District 1 as compared to the rest of the city (ECF 1 at ¶¶ 32, 33). Plaintiffs have also shown the history of racial appeals when Councilman Shemwell ran for office and the City's treatment of the councilman since he took office. In conclusion, Plaintiffs adequately allege the *Gingles* preconditions and the totality of circumstances.

**D.      Finally, and alternatively, if this Court finds Plaintiffs' claims deficient in any respect, Plaintiffs seek leave to amend their Complaint to address any defects the Court observes in Their pleadings.**

As detailed above, Plaintiffs have adequately plead their claims against the City of McKinney. However, should this Court disagree, Plaintiffs request leave to amend and address any deficiencies identified by the Court. In accordance with Federal Rule of Civil Procedure Rule 15(a), leave to amend "shall be freely given when justice so requires," and "should be granted absent some justification for refusal." *U.S. ex rel. Willard v. Humana Health Plan of*

*Tex. Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182.

## <u>CONCLUSION</u>

For at least these reasons, Plaintiffs respectfully request that Defendant's 12(b)(6) motion to dismiss be denied in its entirety. Alternatively, should this Court determine that Defendant's motion should be granted in some respect, Plaintiffs respectfully request that they be granted leave to amend her Complaint pursuant to Federal Rule of Civil Procedure 15(a). Plaintiffs further request all such other relief to which they may be entitled, by law or in equity.

Respectfully Submitted,

**ATTORNEYS FOR PLAINTIFFS**

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 2, 2020, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Blerim Elmazi*
**Blerim Elmazi**